IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

02 MAY 15  AM 10: 17

U.S. DISTRICT COURT
N.D. OF ALABAMA

JANET WILSON,                        )
                                     )
          Plaintiff,                 )
                                     )
v.                                   )        Case No. CV-00-TMP-3582-S
                                     )
YOUNG WOMEN'S CHRISTIAN              )
ASSOCIATION OF BIRMINGHAM            )
(a.k.a. YWCA of BIRMINGHAM),         )
and YWCA FOUNDATION,                 )
                                     )
          Defendants.                )

**ENTERED**

**MAY 1 5 2002**

## MEMORANDUM OPINION

This cause is before the court on the motion for summary
judgment filed on December 10, 2001, by the defendants, Young
Women's Christian Association of Birmingham ("YWCA") and YWCA
Foundation.  On January 2, 2002, plaintiff filed a motion to extend
time to file a response in opposition to the motion for summary
judgment.  On January 4, 2002, the court entered an order granting
the motion for extension, making plaintiff's response due within
twenty days.  On January 24, 2002, the plaintiff filed a brief in
opposition to the motion for summary judgment.  On February 4,
2002, defendant YWCA filed an additional brief in support of its
motion for summary judgment, along with a motion to strike
plaintiff's personal statement of events.  Defendant YWCA asserts
that the claims of the plaintiff are due to be dismissed on the
merits.  YWCA Foundation moves for summary judgment on the grounds

35

that it was not plaintiff's employer,[1] and alternatively adopts and incorporates YWCA's arguments contained in its motion for summary judgment.   These issues have been briefed by both parties.   The parties have consented to the exercise of jurisdiction pursuant to 28 U.S.C § 636(c); accordingly, the court enters this memorandum opinion.

## I.  FACTS

The plaintiff, Janet Wilson, is a black female and a resident of Birmingham, Alabama.  (Complaint ¶ 2).  Wilson was employed with the defendant, YWCA, in 1979.  (Plaintiff's Depo. p. 17). Plaintiff's immediate supervisor was Dot Allbritton, Director of Child Care Services.  (Plaintiff's Depo. pp. 82-83).  Carolyn Howell, the Associate Executive Director of Operations, was Allbritton's supervisor. (Plaintiff's Depo. pp. 82-83). Plaintiff was employed first as a teacher's aide and later as a teacher at the YWCA for approximately twenty years.  (Complaint ¶7). Plaintiff claims that defendants, YWCA and YWCA Foundation, discriminated against her because of her race in violation of 42 U.S.C. § 1981 and Title VII.  Additionally, plaintiff claims that defendants subjected her to a racially hostile environment, violated her due process rights under 42 U.S.C § 1983, and negligently retained her supervisor.

---

[1]   Because summary judgment is due to be granted on the merits as to all claims, the court need not decide whether YWCA Foundation was the plaintiff's employer .

Plaintiff was transferred several times during her tenure at the YWCA. (Plaintiff Depo. p. 68).  Plaintiff was hired as a teacher's aide and worked in that capacity for about five or six years.  (Plaintiff Depo. p. 18).  After working as an aide, plaintiff was moved to a position as a teacher in the classroom for two-year-olds, where she remained for about ten years.  (Plaintiff Depo. p. 18-19).  Later, Wilson was moved to a position as a teacher in the classroom for one-year-olds in 1997.  At that time, plaintiff asserts that Carolyn Howell hit the wall of the classroom in anger and yelled at her after plaintiff pulled some items that she had made off the wall of the two-year-olds' classroom in order to take them to the one-year-olds' classroom. (Plaintiff Depo. pp. 91-94). (Plaintiff Depo. p. 19).  Karen Means, a black female, replaced plaintiff in the two-year-olds' classroom. (Plaintiff Depo. p. 31).[2]  Finally, after the YWCA moved into a newly remodeled building during the latter part of 1998, Wilson was transferred to the classroom that provided daycare for homeless children, known as "KIDS Korner." (Plaintiff Depo. p. 19). Plaintiff remained in this position until her termination on December 13, 1999. (Plaintiff's Depo. p. 20).

Plaintiff complains that, during her employment with the YWCA, Howell harassed her and other African-American employees.  For

---

[2]   Plaintiff does not claim that her transfer to the one-year-olds' classroom was based on race. (Plaintiff Depo. p. 32).

3

example, in addition to the incident mentioned above, she asserts that Howell once stated that plaintiff had unnecessarily called for an ambulance for a child that was not sick enough to go to the hospital. (Plaintiff Depo. p. 85). Additionally, plaintiff contends that she was harassed when Howell told Allbritton that parents were staying too long in the plaintiff's room after their children were dropped off. (Plaintiff Depo. p. 87). Finally, plaintiff complains that in late 1997 or early 1998 Howell shouted at another employee, Shireka Smith: "You haven't felt my wrath yet." (Plaintiff Depo. pp. 132-134). Plaintiff admits that this conversation did not involve her and that she was not even present when it occurred; Smith told her about the alleged comment. (Plaintiff Depo. pp. 133-134).

Plaintiff claims that her transfer to the homeless-children daycare classroom was a demotion because there already was one teacher, Emma Peavy, in this classroom. (Plaintiff Depo. pp. 66-67). She claims that no other classroom had two teachers and that Peavy, the other teacher in the classroom, gave her orders that she felt she had to follow.[3] (Plaintiff Depo. pp. 66-67). Plaintiff

---

[3]     Howell stated that there were two teachers in the homeless daycare because these children came from a more "strenuous" background. (Howell Depo. pp. 92-93). Additionally, Howell also stated that there have been two teachers in the homeless daycare for the past three years. (Howell Depo. p. 153). Plaintiff was told that she and Peavy would be co-teachers. (Howell Depo. p. 155).

admits, however, that she was never told that she was demoted or that her pay was reduced. (Plaintiff Depo. pp. 65-66).

Plaintiff attended professional-development workshops and classes while she was employed by the YWCA, the costs of which were paid by the YWCA. (Plaintiff Depo. pp. 13-15). Plaintiff received her CDA certificate, a certificate for child care workers, in 1995. (Plaintiff Depo. pp. 11-13). Plaintiff also was paid for her time while she attended these classes. (Plaintiff Depo. pp. 11-13).

On December 3, 1999, Carolyn Howell issued a memorandum, entitled "Santa's Workshop," to all YWCA staff. (Def. Ex. 2). Santa's Workshop is a yearly program for the homeless children in KIDS Korner and ASEP. (Plaintiff Depo. p. 46; Howell Depo. pp. 27-28). The Santa's Workshop memo stated that the YWCA would need staff to help direct the volunteers at the workshop, and that staff employed in the child care areas were expected to assist with the WorkShop. Additionally, the memo stated, "Kids Korner staff, some shelter staff, some day care staff and as many other willing YW elves would be appreciated." (Def. Ex. 2). The memo directed employees to check with Carolyn Howell, Dot Allbritton, or Elizabeth Goodrich for assignments. (See Def. Ex. 2). Plaintiff admits that she received the memo when it was placed on the microwave in her classroom, but she never read it because "they did not give it to me in my hand." (Plaintiff's Depo. pp 46-47). In previous years when she had worked at the workshop, there had been

5

a staff meeting or Howell had come to her directly to discuss her duties. (Plaintiff Depo. pp. 47, 51). Plaintiff also admits that she knew the workshop was for the homeless children in her daycare classroom and that it was on Saturday, December 11, 1999. (Plaintiff Depo. p. 64). However, neither the plaintiff nor Peavy attended the Santa's Workshop on December 11, 1999. (Howell Depo. pp. 16-17).

On December 13, 1999, the Monday following the Workshop, plaintiff was terminated for her absence at the Workshop. (Plaintiff Depo. p. 37). Howell called plaintiff and Peavy upstairs and told plaintiff that another employee had stated that she was bragging that she was not going to attend the Workshop.[4] (Plaintiff Depo. p. 38). Plaintiff told Ms. Howell that she did not attend the workshop because she was not personally asked to attend. Plaintiff asserts that there was usually a staff meeting to discuss the Workshop and that Ms. Howell would usually ask her to come. (Plaintiff Depo. pp. 41-43).

Peavy, a black female who worked with plaintiff in the homeless children's daycare classroom, was not fired for her absence at Santa's Workshop, but instead received a written reprimand. (Howell Affi. ¶ 17). Peavy told her supervisors that she did not know that she was required to attend the Santa's

---

[4] Plaintiff states in her deposition that she did not tell anyone that she was not coming to the workshop. (Plaintiff Depo. p. 52).

6

Workshop, and there were no accusations that she boasted about not being present.  In the past, Peavy had always been out of town during the Workshop, visiting relatives in California, and, therefore, did not understand that she was required to attend. (Howell Depo. pp. 139-140).  There is no evidence that she knew about the memo placed on the microwave in the daycare classroom, and plaintiff admits that Peavy was not present when the memo was delivered. (Plaintiff's Depo. pp. 46-47).  Howell and Allbritton concluded her absence was a mere mistake and unintentional. (Howell Affi., ¶ 17).  Plaintiff also claims that Valerie Thompson, a white female who worked with the residents at the YWCA not in childcare services, did not attend the workshop and was not fired. (Plaintiff Depo. p. 61).[5]  It is undisputed that Thompson did not work in the childcare area as did plaintiff.

After plaintiff's termination by Howell, the security guard was asked to help remove the plaintiff from the building. (Plaintiff Depo. p. 55).  Plaintiff walked to the elevator with the guard and talked with him about the situation.  (Plaintiff Depo.

---

[5] Plaintiff also states in her brief in opposition to the motion for summary judgment that Dani Harrington, a white female, did not attend the workshop but was not fired.  (Plaintiff's Brief p. 3).  Plaintiff's personal statement, however, conflicts with the statement in the brief because plaintiff states that Harrington was at the workshop and told her that there were many volunteers present.  (Plaintiff's Personal Statement).  Plaintiff was not at the workshop and has no personal knowledge of who attended. Because plaintiff has offered only hearsay on this point, there is no admissible evidence concerning whether or not Harrington attended the Workshop.

p. 55).  Howell came to the elevator, put her foot in the door, pointed her finger at plaintiff's face, and told her to shut her mouth.  (Plaintiff Depo. pp. 55-56).

Following plaintiff's termination, substitutes were used temporarily to fill the vacant position in the homeless daycare. Dani Harrington, a substitute floater in other classrooms at the YWCA, was used primarily to fill the position; however, other substitutes also worked in the homeless daycare position.  (Howell Depo. p. 99).  Harrington previously was hired as a substitute floater and not as a teacher.  (Howell Depo. p. 100).  Plaintiff claims that Harrington replaced her for "a couple of weeks, probably a month."  (Plaintiff Depo. p. 32).  The plaintiff bases this belief on a phone conversation that she had with Harrington. Some three months after plaintiff's termination, on March 23, 2000, the YWCA hired Claire Fray, an African-American female, to replace the plaintiff in the homeless daycare classroom.  (Howell Affi., ¶ 20).

The YWCA gives its employees annual bonuses based on their number of years of service.  (Plaintiff Depo. p. 169).  Plaintiff claims that she was due a bonus at the end of 1999 in recognition of her twenty years of service at the YWCA.  (Plaintiff Depo. p. 169).  However, plaintiff admits that she knew that she had to work until the end of the year to receive the bonus,  (Plaintiff Depo. p. 169), but points out that Nachite Sager, a black female,

received her bonus, even though she was terminated on December 15, 1999, two days after plaintiff's termination.

Plaintiff also asserts that she complained to Albritton that Howell treated her unfairly. (Plaintiff Depo. p. 101). She told Allbritton that Howell would come into the room and suggest things had happened even though she was not there at the time. (Plaintiff Depo. p. 102). Plaintiff admits that she never complained to anyone in YWCA management about racial harassment. (Plaintiff Depo. p. 110).

Plaintiff states that the termination has affected her social life and as a result she now takes Paxil for her nerves and depression. (Plaintiff Depo. p. 234.) She also claims that, although she has taken blood pressure medicine since she was 24 years old, she has been required to take additional medicine since her termination. (Plaintiff Depo. p. 236). Plaintiff further asserts that she has received counseling by her pastor since her termination. (Plaintiff Depo. p. 237). Plaintiff also filed a grievance with the YWCA after being terminated. (Plaintiff Depo p. 190).

## II.  SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to inter-rogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324. "[T]he plain language

10

of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Id</u>. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id</u>. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Id</u>. at 249.  His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Id</u>. at 251-52; <u>see also</u> <u>Bill Johnson's Restaurants, Inc. v. N.L.R.B.</u>, 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S.

574, 586 (1986).   If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).   Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).   Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.   The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III.  DISCUSSION

#### A.  Title VII Claims

Plaintiff asserts race discrimination claims pursuant to Title VII, relating both to her termination and to a racially-hostile work environment prior to termination.  As a prerequisite to filing a suit under Title VII, a plaintiff first must file an EEOC charge of discrimination.  See 42 U.S.C. § 2000e-5(e).  Plaintiff further

12

has the burden of proving that she timely filed an EEOC charge before she may bring suit under Title VII.  See Maynard v. Pneumatic Products Corp., 256 F.3d 1259, 1262 (11th Cir. 2001)(citing Love v. Pullman Co., 404 U.S. 522, 523, 92 S. Ct. 616, 30 L. Ed. 2d 679 (1972).  While plaintiff did interview with the EEOC, she admits she never filed a charge of discrimination. (Plaintiff Depo. pp. 184-185).  In light of the plaintiff's failure to file a charge, the defendants are entitled to summary judgment in their favor on any Title VII claim brought by her.

### B.  Due Process Claim and § 1983 Claim

Plaintiff contends that the defendants have deprived her of a constitutionally protected right - her property interest in continued employment - without procedural due process of law in violation of the Fourteenth Amendment and 42 U.S.C. § 1983.  An individual who is deprived of "liberty" or "property" through governmental action is entitled to "due process of law," which includes as a minimum notice of the basis for the deprivation and an opportunity to be heard, pursuant to the Fourteenth Amendment. See U.S. Const. Amend 14.  Plaintiff must show that she has an identifiable property interest in the continuation of her employment in order to state a claim under the due process clause and § 1983.  Additionally, the plaintiff must prove that it was governmental action that deprived her of this interest without "due process of law."

13

The Supreme Court held in <u>Board of Regents v. Roth</u> that a person has a property interest in employment if there is a "legitimate claim of entitlement" to his position.    <u>Board of Regents v. Roth</u>, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972).  Therefore, if a current employee has nothing more than a "mere expectancy" of continued employment, there is no property interest to protect.  <u>Id.</u>

The Court may examine state law to determine whether a property interest in employment has been created under state law. <u>Roth</u>, 408 U.S. at 577.  Alabama law provides that employees are terminable at will unless there is an employment contract to the contrary.  <u>See Hoffman-La Roche, Inc. v. Campbell</u>, 512 So. 2d 725, 728 (Ala. 1987).  An employee handbook may create an interest in continued employment if certain requirements are met.  First, the language contained in the handbook must be specific enough to constitute an offer.  Second, the offer must have been communicated to the employee by issuance of the handbook or otherwise.  Third, the employee must have accepted the offer by retaining employment after she has become generally aware of the offer.  <u>Id.</u> at 735.  In the instant case, the YWCA's personnel policies state that the YWCA retains the right to terminate immediately and without notice or further pay or benefits, employees whose performance or behavior is not satisfactory.  (Def. Ex. 6).  Therefore, the employee handbook at issue in this case did not create an entitlement to continued

employment.   It set no term of employment or otherwise limit the right of the employer to terminate the employment at will.

Plaintiff in this case concedes she did not have an employment contract or any assurance that her employment would be continued. She states only that she was employed at the YWCA for twenty years, but this, in itself, is insufficient to provide a property interest.   Pursuant to the governing state law, the plaintiff was an employee at-will and did not hold a protected property interest in continued employment.   Therefore, the defendants are entitled to summary judgment on the plaintiff's § 1983/Due Process Claim.

Even if the plaintiff were able to prove that she had a property interest in continued employment, she also must show that the YWCA was a "state actor" in order to prevail on her § 1983 claim.   Section 1983 offers relief to persons who have been deprived of a federal right by someone acting under "color of state law." Flagg Brothers, Inc. v. Brooks, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978); Patrick v. Floyd Medical Center, 201 F.3d 1313, 1315 (11th Cir. 2000).   Therefore, a claim can successfully be brought under § 1983 only if the defendant is a "state actor." See 42 U.S.C § 1983.   "Only in rare circumstances can a private party be viewed as a 'State actor' for section 1983 purposes." Harvey v. Harvey, 949 F.2d 1127, 1130 (11th Cir. 1992).   To hold private parties responsible under § 1983, it must be proven that: "(1) the State has coerced or at least significantly encouraged the

15

action alleged to violate the Constitution; (2) the private parties performed a public function that was traditionally the exclusive prerogative of the State; or (3) 'the State had so far insinuated itself into a position of interdependence with the [private parties] that it was a joint participant in the enterprise.[]'" Rayburn v. Hogue, 241 F.3d 1341, 1347 (11th Cir. 2001)(citing NBC, Inc. v. Communications Workers of America, 860 F.2d 1022, 1026-27 (11th Cir. 1988). The plaintiff offers no evidence that even arguably applies under the first two conditions. Furthermore, the plaintiff does not offer any evidence to bring her claim within the third condition, since she has failed to present sufficient evidence that the YWCA has a substantial relationship with the state. See Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S. Ct. 449, 42 L. Ed. 2d 477 (1974). In Jackson, the Court stated that the "inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." Jackson, 419 U.S. 345, 351 (1974)(citing Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 176 (1972)). The plaintiff makes only conclusory statements that the YWCA receives money from the State, which alone does not prove the necessary nexus between the state and the alleged unconstitutional action. Plaintiff simply has not satisfied any of the three elements necessary to convert the actions of a private actor into

16

that of a State actor.  Consequently, summary judgment is due to be granted in favor of the defendants on plaintiff's § 1983 and Due Process Claims.

### C.  Section 1981 Race Discrimination Claims

Plaintiff also asserts race discrimination claims pursuant to 42 U.S.C. § 1981.  This statute provides that "all citizens shall have the same right to 'make and enforce contracts.'"  See Brown v. American Honda Motor Co., 939 F.2d 946, 949 (11th Cir. 1991).  This has been construed to prohibit racial discrimination in the formation and execution of contracts, including employment contracts.  To succeed on any § 1981 claim, a plaintiff must prove intentional racial discrimination.  Brown, 939 F.2d at 949.

The plaintiff does not assert direct or statistical evidence as a means to prove discrimination; therefore, she must rely on circumstantial evidence of discrimination.  The McDonnell Douglas analysis that is used to prove race discrimination under Title VII also is the appropriate model to evaluate § 1981 claims.  See Turnes v. AmSouth Bank, 36 F.3d 1057, 1060 (11th Cir. 1994)( citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)).  Therefore, the disparate treatment alleged by Wilson is analyzed pursuant to the McDonnell framework.

To prove disparate treatment as to her termination claim, the plaintiff first must offer evidence that establishes a *prima facie* case of race discrimination.  To demonstrate a *prima facie* case,

17

the plaintiff must prove that: (1) she is black; (2) she was qualified for the position of daycare teacher; (3) she was terminated; and (4) the YWCA replaced her with a non-black employee. See Howard v. BP Oil Co., 32 F.3d. 520, 524 (11th Cir. 1994). In the instant case, there is no argument that the first three elements are satisfied. However, the defendants argue that the final element is not satisfied because the YWCA replaced Wilson with another African-American, Claire Fray. The plaintiff contends that Dani Harrington, a white female working as a teacher's aide "floater," replaced her for a couple of weeks or a month. (Plaintiff Depo. p. 32).

The plaintiff's sole basis for this belief is a phone conversation that she had with Harrington in which Harrington stated that she was working with Peavy. Harrington did not state that she had taken over the plaintiff's position. (Plaintiff Depo. p. 35). Harrington already was employed by the YWCA as a teacher's aide and already worked in the classroom with the plaintiff and Peavy as a floater prior to the time of plaintiff's termination. (Plaintiff Depo. p. 36). Harrington assisted Peavy in the KIDS Korner infant classroom after Wilson was terminated. In addition to Harrington, the YWCA contacted other substitute teachers to assist Peavy after plaintiff was terminated. (Howell Depo. ¶ 20). Even if Ms. Harrington's statements to the plaintiff were sufficient to prove that she did in fact replace the plaintiff,

18

they are hearsay and not admissible evidence.  The YWCA claims that Claire Fray, an African-American, was hired to replace plaintiff on March 23, 2000,  (Howell Affi., ¶ 20), and plaintiff has responded only with the conclusory statement that Harrington replaced her.

The Eleventh Circuit has spoken to the issue of whether a "temporary" replacement of an employee is sufficient to meet the fourth element of the McDonnell Douglas test, and, like other circuits, has held that a mere temporary redistribution of the terminated employee's duties does not make the first person assigned to perform those duties a "replacement" for purposes of this analysis.  Hawkins v. Ceco Corp., 883 F.2d 977, 984 (11th Cir. 1989), cert. denied, 495 U.S. 935 (1990).  As the Sixth Circuit has explained, "[A] person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties,  or  when  work  is  redistributed  among  other  existing employees already performing related work."  Barnes v. GenCorp, Inc., 896 F.2d 1457, 1466 (6ᵗʰ Cir. 1990); see also Clevidence v. Wayne Savings Community Bank, 143 F.Supp.2d 901 (N.D. Ohio, 2001). Another court has written:

> The limited case law in this area suggests the Court
> should look to the permanent replacement employee, not
> the temporary fill-in., See e.g., Hawkins v. Ceco Corp.,
> 883 F.2d 977, 984 (11th Cir. 1989), cert. denied, 495
> U.S. 935 (1990)(replacement to be considered was minority
> hired permanently, not nonminority temporary worker);
> Ashagre v. The Southland Corp., 546 F.Supp. 1214, 1219
> (S.D. Tex.1982)(plaintiff's replacement was minority

hired on permanent basis, not existing nonminority
employee who worked shift temporarily).

Sheets v. National Computer Systems, Inc., 2000 WL 33364120 (S.D.
Iowa, 2000). Therefore, even if Harrington and other employees of
the YWCA temporarily performed plaintiff's duties, the permanent
replaced hired to fill her former position was herself a black
female. Consequently, plaintiff has failed to offer proof that she
was replaced by a person outside her protected class. Accordingly,
plaintiff cannot establish a *prima facie* case of termination based
on race discrimination.

Even if the plaintiff has established a *prima facie* case, under
the McDonnell Douglas model the defendant has offered a legitimate,
nondiscriminatory reason for its decision to terminate the
plaintiff. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802
(1973). Having done so, the burden shifts back to the plaintiff to
show that the reason is not worthy of belief or that, in light of
all the evidence, a discriminatory reason more likely motivated the
decision than the proffered reason. Standard v. A.B.E.L. Servs.
Inc., 161 F.3d 1318, 1331-33 (11th Cir. 1998)(citing Combs v.
Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997), cert.
denied, 52 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998)).

In the instant case, the YWCA states that its reason for
plaintiff's termination was that the plaintiff intentionally failed
to attend Santa's Workshop. Because the defendant has presented a

20

legitimate, non-discriminatory reason for the termination, plaintiff must next show that this reason was a pretext for racial discrimination.

To do so, plaintiff argues that other YWCA employees did not attend the Workshop and were not fired and that, therefore, the reason stated by the YWCA is pretextual.  Plaintiff has identified only two other employees who did not attend the Workshop, Peavy and Valerie Thompson.[6]  However, one of these employees, Peavy, is another African-American.  Certainly, plaintiff cannot establish that her termination was racially motivated by pointing out that another black employee was *not* fired for failing to attend the Workshop.  Additionally, it appears that Peavy failed to attend the Workshop due to a mistake, not an intentional decision to stay away.  The other person, Valerie Thompson, was not similarly situated to plaintiff because she worked with the residents of the YWCA, not in the childcare or homeless daycare areas, for which the Workshop was created.  (Plaintiff's Depo. p. 61; Howell Depo. p. 27).  The December 3 memo clearly distinguished between employees

---

[6] Plaintiff offers conflicting positions as to whether Dani Harrington, a white female, attended the Workshop.  The plaintiff's brief in opposition to the defendants' motion for summary judgment states flatly that Dani Harrington did not attend the workshop and was not fired (Plaintiff's brief p. 3); however, her "personal statement" conflicts with her brief because there plaintiff states that, "Dani was in the Day Care for the Homeless Workshop and she told me that it was more volunteers than children." (Plaintiff's Personal Statement).  Plaintiff was not at the workshop and has no personal knowledge concerning which employees did or did not attend; thus, *her* statements either way are inadmissible hearsay.

in the childcare area and others, expressing an expectation that childcare workers would be present, while others were urged to volunteer.  Further, there simply is no other evidence offered to establish that Thompson *intentionally*, and without being excused, failed to attend the Workshop as plaintiff did.  Accordingly, plaintiff has failed to present substantial evidence that raises a doubt as to the credibility of the reason expressed by the defendant.  Thus, failing to create a genuine issue of fact concerning whether the articulated reason for termination actually is pretext, there is no evidence that the termination was based on Wilson's race.  Defendant's motion for summary judgment on this claim is due to be granted.

### D.   Section 1981 Claim for Discrimination in Other Terms and Conditions of Employment

The plaintiff further asserts a claim pursuant to Section 1981 that she was discriminated against because of her race with respect to the terms and conditions of her employment.  Again, the plaintiff must establish a *prima facie* case of race discrimination. She must establish that: (1) she is a member of a protected class; (2) she was similarly situated with a person outside of her protected class, and (3) she was denied a condition of employment afforded the similarly situated person.  Alexander v. Fulton County, 207 F.3d 1303, 1344 (11th Cir. 2000).

22

First, the Plaintiff claims that she was denied training offered to others.  However, she alleges only that four African American women were offered opportunities for training that she was not offered.  These persons were Karen Means, Nachite Sanger, YangJa Burton and Rena Goodwin. (Plaintiff Depo. p. 128). Therefore, plaintiff cannot establish a *prima facie* case of race discrimination based on the denial of training, since she has not pointed to a person outside her protected class that was afforded training that she was denied.  Therefore, summary judgment is due to be granted in favor of the defendants on the plaintiff's training claim.

In her deposition, Plaintiff also seems to complain that she was denied the opportunity to have "school" paid for by the YWCA, while Cathy Jenkins and Carolyn Howell, white females, were allowed to attend "school" paid for by the YWCA. (Plaintiff Depo. pp. 325-326).  Defendant YWCA's Educational Benefits Guidelines are set forth in the employee handbook.  It states that if an employee is taking a YWCA-approved class, tuition will be reimbursed if the employee receives specified grades. (Def. Ex. 6).  The language makes clear that plaintiff must first take the class, pay the tuition, and receive the requisite grade in order to then qualify for reimbursement.[7]  Plaintiff did not take any classes or apply

---

[7]  Plaintiff does not have personal knowledge and does not claim to know whether the two employees mentioned above went to school and later had the tuition reimbursed pursuant to this

23

to any educational program for which she could later be reimbursed. She did, however, apply for her CDA (Child Development Associates) certificate. She admits that Child Care Resources paid for the CDA courses as a benefit of her employment at the YWCA. (Plaintiff Depo. pp. 326-327). Accordingly, plaintiff has not satisfied her burden of presenting evidence that she was denied a condition of employment that was afforded to someone outside her protected class.

Similarly, plaintiff alleges that she did not receive benefits to which she was entitled at the time of her termination. It seems clear through her deposition that plaintiff is referring to a bonus that she was to receive at the end of the year in which she was terminated. (Plaintiff Depo. pp. 168-169). Again, plaintiff has failed to satisfy the requirement that she was denied a term or condition of employment afforded to someone outside her protected class. The plaintiff admits that to qualify for the bonus employees must work until the end of the year, but she claims that another employee who was fired the same week as she received a bonus check. However, the other employee was Nachite Sanger, an African-American female. (Plaintiff Depo. pp. 169-171). Therefore, plaintiff has failed to show that someone outside her protected class received a bonus without completing the year of employment, thus being afforded a term or condition of employment that she was

guideline.

denied. Accordingly, this claim also is meritless and the defendants' motion for summary judgment is due to be granted as to this claim.

Additionally, any claim that the plaintiff was discriminated against because of her race with respect to pay also must be dismissed for lack of a *prima facie* showing of discrimination. Plaintiff's only evidence on this claim is that she once saw Karen Means' paycheck and that Means was paid more than she. Means is a black female. Plaintiff has failed to offer any evidence that someone outside her protected class was paid more than she. Therefore, plaintiff again has failed to prove that element of a *prima facie* showing necessary to establish a claim.

Finally, the plaintiff complains that she was denied promotions that were offered to people outside her protected class. To prevail on this claim the plaintiff must establish a *prima facie* case by showing that: (1) she was a member of a protected class; (2) she applied for and was qualified for the promotion; (3) she was denied the promotion; and (4) the person who got the promotion had lesser or equal qualifications and is not a member of a protected class. <u>Carter v. Three Springs Residential Treatment</u>, 132 F.3d 635 (11th Cir. 1998).

In the instant case, plaintiff has not offered any evidence that she applied for any promotion. She only states that she was not offered any promotion and that she thought that jobs had to be

offered to you before you could apply.  (Plaintiff Depo. p. 324).
Defendant has offered evidence that the YWCA did make job
opportunities known to its employees.  Additionally, plaintiff
states that some people who began working when she did were moved
to office jobs and she was not.  However, she does not offer any
evidence that she expressed an interest in any particular job to
any YWCA manager, that she was qualified for any particular job, or
that she ever asked to be placed in any particular job.  *See* *Walker*
*v. Prudential Property and Casualty Insurance Co.*, 286 F.3d 1270
(11th Cir. 2002)("The *prima facie* case creates a presumption of
discrimination.  The application requirement is important to
establishing this presumption because it shows that the decision-
maker knew about the plaintiff and the plaintiff's interest in the
position.").  Therefore, without more evidence to support her *prima
facie* case of discrimination with respect to promotions, the
defendants' motion for summary judgment is due to be granted.

### E.  Hostile Environment Claim

The plaintiff next claims that she was subjected to a racially
hostile work environment.  To establish a hostile environment claim
the plaintiff must show: (1) that she was a member of the protected
class; (2) that she was subjected to unwelcome harassment; (3) that
the harassment was based on her race; (4) that the harassment was
sufficiently severe or pervasive to alter the terms and conditions
of employment and create a discriminatorily abusive working

26

environment; and (5) that the employer is responsible for such environment under a theory of either vicarious or direct liability. Miller v. Kenworth of Dothan Inc., 277 F.3d 1269, 1275 (11th Cir. 2002). To prevail on a hostile environment claim, the plaintiff must show that but for her race she would not have been harassed. See Henson v. City of Dundee, 682 F.2d 897 (11th Cir. 1982). A hostile work environment is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." Harris v. Forklift Systems, Inc. 510 U.S. 17, 21. (1993).

There is no dispute that plaintiff is a member of a protected group. However, plaintiff has failed to show that she was subjected to any harassment whatsoever because of her race. In her deposition, plaintiff describes several incidents that she believes constitute racially hostile harassment. One incident directly followed her termination and therefore should not be taken into consideration. On December 13, 1999, following plaintiff's termination, Howell followed her to the elevator, where she stood talking to a security officer, put her foot in the door of the elevator and told plaintiff to shut her mouth. (Plaintiff Depo. p. 94). During her employment, plaintiff felt that she was harassed because of her race when Howell stated to her that a child was not sick enough to go to the hospital after the plaintiff had called an

27

ambulance to the YWCA for the child.  (Plaintiff Depo. p. 85).
Also, plaintiff asserts that she was harassed because of her race
when Howell told Allbritton that parents stayed too long in the
plaintiff's room after dropping off their children.  (Plaintiff
Depo. p. 87).  Additionally, plaintiff felt harassed because of her
race when Howell hit and kicked a classroom wall and loudly told
her to shut her mouth.[8]  (Plaintiff Depo. pp. 91-92).  This
exchange between Howell and plaintiff occurred when plaintiff was
removing things from the classroom wall when she was transferred to
another classroom.  (Plaintiff Depo. pp. 92-93).  Also, although
plaintiff did not assert this instance when asked in deposition
about the hostile environment, in her brief in response to the
motion for summary judgment, she claims that she was demoted and
transferred to different classrooms, thereby creating a hostile
environment (Plaintiff's brief p. 6).  Finally, plaintiff complains
that a hostile work environment was created when Howell told
another employee, in a conversation not involving plaintiff: "You
haven't felt my wrath yet."  (Plaintiff Depo. pp. 129-33).

     In Gupta v. Florida Board of Regents, the Court, when speaking
about a Title VII hostile environment claim, stated that Title VII
"is not a general civility code".  Gupta v. Florida Bd. Of Regents,
212 F.3d 571 (11th Cir. 2000)(citing Faragher v. City of Boca

---

     [8]     Howell denies that she hit and kicked the wall.  (Howell
Depo. 173).

Raton, 524 U.S. 775 (1998)). While all of the incidents complained of by plaintiff may constitute rude and inappropriate behavior for a professional person in the workplace, plaintiff offers no evidence that these actions were taken because of her race. Plaintiff admits that no one at the YWCA ever used racial epithets or slang words, made racial jokes, or uttered racial slurs. (Plaintiff Depo. pp. 96-97). None of the incidents about which plaintiff complains appear to have any racial component at all, but typical examples of workplace behavior that may occur anywhere there is a demanding supervisor. Plaintiff has failed to offer evidence that the conduct complained of was based on her race. Further, the combined effect of these incidents during a twenty-year period of employment fails to rise to the level of being severe and pervasive enough to create a hostile environment. Thus, defendants' motion for summary judgment on the plaintiff's hostile environment claim is due to be granted.

### F. State Law Claim: Negligent Retention

Plaintiff also sets forth in her complaint a state law claim of negligent retention. However, when the discrimination claim fails, as is in the instant case, so must the derivative negligent retention claim. See Levesque v. Regional Med. Ctr. Bd., 612 So. 2d 445, 449 n.5 (Ala. 1993). Moreover, plaintiff failed to offer any evidence that any employee of the defendants was incompetent or that the defendants had any notice of the alleged incompetence.

29

See, e.g., Lane v. Central Bank of Alabama, 425 So. 2d 1098, 1100 (Ala. 1983)(holding that an employer is responsible for "his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him"). Accordingly, summary judgment is due to be granted in favor of the defendants on plaintiff's state law claim of negligent retention.


### III.   CONCLUSION

Based on the foregoing facts, viewed most favorably for the plaintiff, and legal conclusions, defendants have demonstrated that there exists no genuine issue of material fact as to any of plaintiff's claims and that they are entitled to judgment as a matter of law.  Accordingly, the court determines that defendants' motion for summary judgment (court document #20) is due to be GRANTED and all of plaintiff's claims are due to be DISMISSED WITH PREJUDICE.

A separate order will be entered herewith granting judgment in favor of the defendants.

DATED this 14th day of May, 2002.


T. MICHAEL PUTNAM
CHIEF MAGISTRATE JUDGE